1                    UNITED STATES DISTRICT COURT
                        DISTRICT OF NEW JERSEY
2

3   _____
    PATRICIA O'CONNOR and        :  Case No. 2:16-cv-05177-JLL-JAD
    MEGAN O'CONNOR,              :
4                                :
              Plaintiffs,        :
5                                :
       vs.                       :  Newark, New Jersey
6                                :  Wednesday, August 8, 2018
    THE DODGE COMPANY, INC.,     :  12:02 p.m.
7   et al.                       :
                                 :
8             Defendants.        :
    _____ :

9                    TRANSCRIPT OF STATUS CONFERENCE
               BEFORE THE HONORABLE JOSEPH A. DICKSON
10                   UNITED STATES MAGISTRATE JUDGE

11  APPEARANCES:

12  For the Plaintiffs:          Law Office of Eric J. Warner, LLC
                                 By:  ERIC J. WARNER, ESQUIRE
13                               233 Mount Airy Road, 1st Floor
                                 Basking Ridge, NJ 07920
14

15  For Defendant
    The Dodge Company, Inc.:     McGivney, Kluger & Cook, P.C.
16                               By:  EMILY R. WEISSLITZ, ESQUIRE
                                 23 Columbia Turnpike, 3rd Floor
17                               Florham Park, NJ 07932

18

19

20  Transcription Company:       KLJ Transcription Service, LLC
                                 P.O. Box 8627
21                               Saddle Brook, NJ  07663
                                 Phone:  (201)703-1670
22                               www.kljtranscription.com
                                 info@kljtranscription.com

23

24  Proceedings recorded by electronic sound recording, transcript
    produced by transcription service.

25

```
1    APPEARANCES (Cont.)

2    For Defendant Pierce
     Chemicals Royal Bond Co.:      Hallett & Perrin, P.C.
3                                   By:  LELAND C. DE LA GARZA, ESQUIRE
                                    1445 Ross Avenue, Suite 2400
4                                   Dallas, TX 75202

5                                   Michelman & Robinson, LLP
                                    By:  BROOKE K. HALEY, ESQUIRE
6                                   800 Third Avenue, 24th Floor
                                    New York, NY 10022
7
     For Defendant Hydrol
8    Chemical Company, Inc.:        Harris Beach, PLLC
                                    By:  DAVID J. DINO, ESQUIRE
9                                   100 Wall Street
                                    New York, NY 10005
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                              I N D E X

2

3     COLLOQUY ON DISCOVERY DISPUTES:                          PAGE

4     Re:   Extension of Discovery Deadlines.. . . . . . . . .  4, 68

5     Re:   Objection to Scope/Breadth "Any and All".. . . . .  6, 29

6     Re:   Material Safety Data Sheets. . . . . . . . . . . . . 15

7     Re:   Warning Labels.. . . . . . . . . . . . . . . . . . . 22

8     Re:   Marketing Materials. . . . . . . . . . . . . . . . . 23

9     Re:   Formulas.. . . . . . . . . . . . . . . . . . . . . . 30

10    Re:   Testing & Inspection.. . . . . . . . . . . . . . . . 37

11    Re:   Processes Used.. . . . . . . . . . . . . . . . . . . 42

12    Re:   Law Governing Chain of Distribution. . . . . . . . 55, 60

13    Re:   Complaints on Products.. . . . . . . . . . . . . . . 56

14    Re:   Litigation Files.. . . . . . . . . . . . . . . . . . 60

15    Re:   Alternative/Foreseeable Uses of Products.. . . . . . 67

16

17

18

19

20

21

22

23

24

25

Colloquy                                    4

1              (Conference commenced at 12:02 p.m.)

2              THE COURT:  All right.  We're on the record on

3    O'Connor versus Dodge, Docket Number 16-5177.

4              May I have appearances, please?

5              MR. WARNER:  Good, I believe it's afternoon at this

6    point, Your Honor.  Eric J. Warner here from the Law Office of

7    Eric J. Warner, LLC, co-counsel for the O'Connors.

8              THE COURT:  Okay.

9              MR. DE LA GARZA:  Your Honor, I'm Leland de la Garza

10   and I'm with Hallett and Perrin, and I'm counsel with Brooke

11   Haley.

12             THE COURT:  Okay.

13             MS. WEISSLITZ:  Good afternoon, Your Honor.  Emily

14   Weisslitz of McGivney Kluger and Cook on behalf of defendant,

15   The Dodge Company.

16             THE COURT:  Okay.

17             MR. DINO:  Good afternoon.  David Dino from Harris

18   Beach on behalf of defendant Hydrol.

19             THE COURT:  Okay.  So, this is a discovery dispute

20   here.  And have you been able to resolve anything since I got

21   papers in on this?

22             MR. DE LA GARZA:  No, Your Honor.

23             MR. WARNER:  Well, I -- Your Honor, certainly I have

24   been speaking with Ms. Weisslitz' firm, McGivney and Kluger

25   and Cook.  She represents The Dodge Company.  She asked for

1    six additional weeks for document production and we have no

2    issue with that.

3           We -- we -- my -- my client is do -- her health is

4    very poor.  It's unlikely, but we may have to do a *de bene*

5    *esse* deposition.  She now has some sort of necrosis as a

6    resultant -- a result in some -- from the treatment that she

7    received.  I only found this out yesterday, so the medical

8    term -- I don't have the -- what the medical terminology

9    necessarily memorized just yet, but my client is not doing

10   very well and so I -- however, we -- if we a -- have another

11   four weeks that we can amass what Your Honor can imagine are

12   the voluminous medical records stemming not only from

13   (indiscernible) but also now from this additional illness, we

14   -- we'd appreciate it.

15          So, that kind -- but otherwise, I think -- I think

16   Ms. Weisslitz and I agreed on that with respect to her need

17   for six weeks and my need for at least four weeks to gather

18   together, you know, medical records and see how my client's

19   health progresses.

20          THE COURT:  All right.  So, let me make sure I

21   understand what's going on.  You're still gathering medical

22   records --

23          MR. WARNER:  Yes, Your Honor.

24          THE COURT:  -- and you want an additional four

25   weeks.  From what, I don't know.  I don't remember what all

1    our dates are, but whatever.

2              And you're looking for six weeks from now?

3              MS. WEISSLITZ:  From today, yeah.

4              THE COURT:  To complete your document production?

5              MS. WEISSLITZ:  Yes.  Your Honor, --

6              THE COURT:  And you're ask -- just so I understand

7    something, because we were talking about this.  Plaintiffs'

8    first set of document demands to all named defendants, that's

9    what you're responding to?

10             MS. WEISSLITZ:  Correct.

11             THE COURT:  So, you're not really part of the fight

12   today.

13             MS. WEISSLITZ:  Correct.

14             THE COURT:  Okay.  And you just need six more weeks?

15             MS. WEISSLITZ:  Yeah.  It's my client -- I think

16   everyone will concede that my client is the heavy in this

17   case.  There's almost 40 products that have been identified by

18   plaintiff that were manufactured by my client and plaintiff is

19   asking for materials that date back to the early '90s, so it's

20   just a matter of getting all of these materials, so my client

21   just needs a little bit more time to get those materials

22   together.

23             We have not lodged the same objections that my co-

24   defendants have lodged.  We just need additional time, plus my

25   client, they recently switched over to a new Website, so for

1   the materials that plaintiff is quest -- requesting relative

2   to pictures of the product bottles and warning labels, we just

3   need additional time to get those to plaintiff.

4           THE COURT:  Well, that raises an interesting

5   proposition in my mind.  If the heavy -- using your words --

6           MS. WEISSLITZ:  Yeah.

7           THE COURT:  -- is going to produce the documents

8   that you're objecting to from her client, what does that do to

9   your objections?  First of all, will these documents -- and

10  this may be a question for you -- obviate the need to get the

11  same documents or similar type documents from the other co-

12  defendants?

13          MR. WARNER:  Well, no, Your Honor.  They all

14  manufacture different products.  It -- you know, it's -- it

15  would be like saying that, you know, documents from Ford will

16  suffice for Chevy.

17          THE COURT:  Well, because I was under the

18  understanding that -- well, this is the problem I'm having.

19          MR. WARNER:  Okay.

20          THE COURT:  Because you had one document demand to

21  all the defendants.

22          MR. WARNER:  Mm-hmm.

23          THE COURT:  For instance, Ms. Haley -- is that who

24  I'm talking to?

25          MS. HALEY:  I am Ms. Haley, yes.

1              THE COURT:  Yeah, I know who you are, but I mean who

2     -- one of the two of you from Pierce Chemicals, --

3              MS. HALEY:  (Indiscernible)

4              THE COURT:  -- are the -- are there 30 identified

5     products, chemicals?

6              MR. WARNER:  So -- right.  So, in -- I -- the exact

7     number in the complaint, I can't -- I can't give a precise --

8     that sounds right, though, Your Honor.

9              THE COURT:  All right.  For purposes of today's

10    argument, let's say 40.

11             MR. WARNER:  That sounds right.

12             THE COURT:  Yeah, but not -- not -- if there are 38,

13    then I am not adding to them.  If there are 47, I'm not taking

14    away.  But we're -- for purposes of today's argument, there

15    are 40.  You asked for the information on all 40 from all of

16    the defendants; right?

17             MR. WARNER:  Well, yes, because, for example, the

18    heavy has I'd say 30 chemicals and -- or 30 products and the --

19    and the rest -- the other three have -- I believe one or two

20    of them only have three or four products.  But, you know,

21    basically, we -- basically, Your Honor, what we need to know

22    is do they contain formaldehyde, were there warnings about

23    formaldehyde, when did the manufacturers first learn about the

24    hazards of formaldehyde, did they put any mark -- did they put

25    any warnings about formaldehyde in their marketing materials.

1   See, these are all manufacturer, distributor, independent --

2              THE COURT:  Well, did they object to those -- I

3   don't think they objected to those.

4              MR. WARNER:  I thought they did.

5              MR. DE LA GARZA:  Your Honor, I am representing

6   Pierce, along with Ms. Haley.

7              And so the complaint against Pierce is that Pierce

8   has one product, Powertone --

9              THE COURT:  Right, I see that.

10             MR. DE LA GARZA:  -- (36 Index) --

11             THE COURT:  And my clerk is reminding me.

12             MR. DE LA GARZA:  Okay.  So, for -- as we understand

13  it, the only complaint against Pierce is that one product, yet

14  one of the reasons that we're objecting to the discovery is

15  that Pierce does manufacture other products, not products that

16  plaintiff has alleged caused this leukemia.  And so, for

17  documents related to all those other products, then we're

18  objecting, --

19             THE COURT:  All right.

20             MR. DE LA GARZA:  -- because it has nothing to do

21  with the case.

22             THE COURT:  Are you looking for products that are

23  not identified in your complaint?

24             MR. WARNER:  Well, --

25             THE COURT:  For inform -- for discovery on products?

Colloquy                                    10

1  Is it the same for --

2            MR. DINO:  Yes, for --

3            THE COURT:  -- your client is also one; right?

4            MR. DINO:  For Hydrol we have one.  We're in the

5  same position as --

6            THE COURT:  Right.  Okay.

7            MR. WARNER:  Well, we respectfully, Your Honor, so

8  it's the -- so far -- as far as we can tell from our initial

9  pleading, it looks like there has been they only have one

10 product each, but we're -- we're reluctant to take our

11 adversaries' word for that all products that -- that we know

12 my client used during her career, that none of other -- none

13 of the other ones that we've identified contain formaldehyde

14 or none of the other ones that -- you know, for example, my

15 recollection of the jurisdictional discovery deposition was

16 that, I mean, in some instances she used -- and I could be

17 wrong and I'm sure I'll be corrected -- but that she used

18 Hydrol products and Pierce products, some of them which may be

19 not have been specifically identified.  We're -- we're just a

20 little reluctant to accept our adversaries' word for it --

21           THE COURT:  Well, how do we identify those products?

22 She worked for -- who did she work for?

23           MR. WARNER:  So, she worked for -- it was a funeral

24 home --

25           THE COURT:  It's not a defendant here today.

                          Colloquy                          11

1              MR. WARNER:  I'm sorry?

2              THE COURT:  It's --

3              MR. WARNER:  Yeah.  Correct.  It would -- right.

4    Because of workers' compensation.

5              THE COURT:  And they basically gave her the products

6    to use in her job.

7              MR. WARNER:  Yes.  Yes, Your Honor.

8              THE COURT:  So, to identify what products she

9    touched, do you have to go through the defendant -- not the

10   defendant -- the employer's records?

11             MR. WARNER:  No, --

12             THE COURT:  Isn't that how we find -- isn't that how

13   we discover them?

14             MR. WARNER:  We -- it -- we -- correct, Your Honor.

15   We -- we -- we have -- and, of course, --

16             THE COURT:  And if their records don't reflect

17   anything other than the one product you've identified from

18   Pierce and Hydrol, then tell me why I should allow you to get

19   information on all the other myriad of products that they

20   manufacturer, which we have --

21             MR. WARNER:  I --

22             THE COURT:  -- we have no indication were in this

23   case.

24             MR. WARNER:  Well, Your Honor, I just -- I don't see

25   any harm if -- if they -- if they do manufacture other

1   formaldehyde-containing products, I don't see any harm why

2   sending how their --

3              THE COURT:  Well, it could be -- because you've

4   asked for 9 -- going back to 1990.

5              MR. WARNER:  Exactly.  Right.

6              THE COURT:  That's a lot of information.

7              MR. WARNER:  At -- at -- well, at this rate, I'm --

8   I'm -- I'm sure that if -- if they -- if there are, you know,

9   material safety data sheets that say that certain chemicals

10  and certain products do contain formaldehyde, we -- we'd like

11  to -- we'd simply like to know about it.

12             THE COURT:  Well, why?  Because they may have --

13  they -- I'm not saying they did, but they may have

14  manufactured 100 products that contained formaldehyde, none of

15  which found their way to your client's employer or your

16  client.

17             MR. WARNER:  Well, I -- for -- that's true, Your

18  Honor, and I think -- I think that -- I think the basis behind

19  this is what we don't believe they did.  I think that they --

20  they manufactured -- and -- and -- and, again, I'll be

21  corrected if I'm wrong -- it wouldn't -- it wouldn't have been

22  100 product -- different products, but -- you know, I -- I --

23  I think that -- you know and generally, though -- and, of

24  course records going back to the '90s with -- were written

25  records and everything to that effect and there may --

1           THE COURT:  That's going to be a lot of work.

2    Depending on -- let's -- let me give -- take you off the hot

3    seat for a minute.

4           Mr. de la Garza, how many product -- do we know how

5    many products containing formaldehyde your client manufactured

6    going back to 1990?

7           MR. DE LA GARZA:  Well, our product -- our client

8    manufactured a bunch of products.  I can't tell you 30, 40,

9    but many products that contained formaldehyde, because

10   formaldehyde is a primary ingredient of embalming-related

11   products.  So, you have different embalming products for

12   different uses.

13          And so this one particular one that is at issue with

14   regard to Pierce is the one that was alleged to have been used

15   by this plaintiff.  You kind of have to go back to the

16   original complaint.  The original complaint wasn't all that

17   clear about the products.  And so we filed the motion to

18   dismiss.  The Court granted the motion to dismiss, ordered

19   repleading, there was repleading, and so now you have a

20   complaint that is very specific about what comp -- what

21   products were used.

22          For example, on page 7 of the complaint, the amended

23   complaint, beginning at paragraph 22, there is a discussion of

24   the specific product.  So we went from maybe some broader ill-

25   defined products to the specific product that was used.

1          So now, the way this case is framed, the plaintiff

2   has pled which specific products were used, not just against

3   Pierce, but against the other defendants, as well.  For

4   example, with regard to Dodge, in paragraph 7 there's a long

5   list of the products that it -- that are alleged to have been

6   purchased by the plaintiff's employer and which she used, and

7   those are the products that are at issue.

8          So now we have a complaint that frames it very

9   specifically, so the issue that I think each of these

10  defendants has is when you asked for us to produce a lot of

11  documents related to other products that you haven't raised as

12  being used and causing the leukemia and you're -- now you're

13  delving into something that is not relevant and it -- the --

14  you know, it's not proportional to the needs of this case.

15  That's why we are objecting to that portion.

16          THE COURT:  I understand.

17          Mr. Warner, I tend to agree.

18          MR. WARNER:  Oh, look, I -- I -- you know, I think --

19  I think probably where this -- you know, I think where --

20  where we went into the weeds here, too, is that we were

21  fighting over the language "any and all."  As long as we -- I

22  -- I -- I -- if they don't want to give us information

23  regarding products that we have not yet been able to identify

24  that she has used, I -- I don't think that that's terribly,

25  again, going to be the end of the world for us.

1        Basically, however, but with respect to the products

2   that we have identified that she has used -- and I just re-

3   reviewed my notes here.  I think that was probably the main --

4   the primary issue here was that we would like to have

5   documents regarding those products.  And since the non-heavies

6   here have -- I -- and I believe they've represented they only

7   have one product each -- you know, as long as they can produce

8   all -- any and all documents regarding those, we -- we have to

9   know about the material safety data sheets, we know -- need to

10   know about warning labels, we need to know about advertising

11   materials, we need to know when they first learned about

12   formaldehyde as -- as hazardous.

13        So -- and -- and that -- and that's fair.  I mean,

14   that -- I -- you know, I -- I think that I don't see any

15   reason why we wouldn't be able to obtain that.

16        THE COURT:  And do you object to providing those

17   types of materials with respect to the one product that has

18   been identified for your client?

19        MR. DE LA GARZA:  No, Your Honor.  For example, we --

20   we've always maintained that the material data safety sheets

21   are the best way for the plaintiff and their counsel to know

22   what was in these products, because it discloses that, as

23   required by federal law.  And counsel was referring to any and

24   all documents, you know, if -- in the beginning, when we

25   conferred, we did have a conference and tried to talk to these

1   issues and we had a discussion about both sides using the

2   beginning of their request saying "any and all documents

3   referring to."  All right?  So, we kind of got past that,

4   because we --

5           THE COURT:  Okay.

6           MR. DE LA GARZA:  -- we both did it.  A good point.

7   So, if we're both doing it, we're not going to be complaining

8   about it.  And so that's not an issue.  That whole "any and

9   all" is not an issue.

10          What's an issue is, for example -- and I would break

11  this down into three categories.  And our letter lays it out

12  in three categories.

13          First, there is a request for documents that relate

14  to conditions or products not in dispute.  So, products not in

15  dispute, we've been talking about that.  And so for conditions

16  not in dispute.  Well, the condition here is she says that she

17  contracted cancer, specifically leukemia, as a result of the

18  use of the product.

19          So, for example, if there is a request for documents

20  related to conditions other than that -- for example, skin

21  irritations, there could be other conditions  that might be

22  caused by using these products -- that we shouldn't have to

23  produce documents related to that, because that's not what's

24  at issue.

25          What the plaintiff is trying to prove is that the

1   formaldehyde in the defendants' products caused her to suffer

2   from leukemia.  That's the only claim at issue.  And so, as

3   we've identified them in our letter -- on page 2 of our

4   letter, we've identified specific document requests 1, 2, 3

5   for Pierce.  For Hydrol it would be 21 and 32.  And that's on

6   page 2 of our letter to the Court.

7               THE COURT:  Mm-hmm.

8               MR. DE LA GARZA:  And so we're saying with respect

9   to those we shouldn't have to answer for irrelevant product

10  defects or irrelevant defective conditions or irrelevant

11  illnesses, because that's not what's raised by the pleadings.

12              We have another category which is --

13              THE COURT:  Okay.  Let me -- let's stop there for a

14  minute.

15              MR. DE LA GARZA:  Okay.

16              THE COURT:  The products we've kind of dealt with.

17  I'm saying that I agree with you.  And unless I'm just missing

18  your point right now, you mean products other than the one

19  identified.

20              MR. DE LA GARZA:  Correct.

21              THE COURT:  And I agree with that and you've --

22              MR. WARNER:  I -- I -- I --

23              THE COURT:  And you're ready to give that up without

24  prejudice for now.

25              MR. WARNER:  Without prej -- well, Your Honor, but I

1  think what my adversary is saying, too, he feels that even for

2  this single product, if there's a skin irritation --

3          THE COURT:  No, no, I know.  I'm going to get there

4  now.  That's --

5          MR. WARNER:  And -- and --

6          THE COURT:  I got that.  So, what do you -- what do

7  you say to that?

8          MR. WARNER:  I mean, I -- you know, I -- I -- I do --

9  we -- I -- I think that it's possible that, you know, -- and,

10 of course, you never want to say it's possible in a federal

11 courtroom, but nevertheless, what we're talking about is over

12 decades here where we didn't have data -- data keeping as well

13 as we do now.

14         For -- for -- let me start it this way.  Material

15 safety data sheets, the -- the -- the law -- the lit -- the

16 item -- the documents that tell you exactly the hazards of the

17 chemicals, how to use them, what to wear, they have changed

18 significant -- they change about two years, as far as I could

19 tell.  They -- they -- they've changed constantly.  So, I -- I

20 mean, basically, we're looking for all those material safety

21 data sheets and, you know, a lot of those material safety data

22 sheets --

23         For example, let's say one -- let's say one product

24 may have a material safety data sheet that says, you know,

25 formaldehyde, that it contains formaldehyde, known to cause

1  cancer to humans, those are in or about 1993.  I think that

2  was when the FDA first started to recognize -- or -- or at

3  least that's when the FDA start -- first started to recognize

4  that it caused cancer in -- in lab rats.  But then, you know,

5  another -- a similar material safety data sheet that for a

6  formaldehyde product from around that time may not have that

7  information in that and I think that would be useful

8  information.

9           I just I don't -- I don't see the harm necessarily

10 in being -- providing the -- these documents for all

11 formaldehyde-containing products.  That's --

12          THE COURT:  I'm just -- you lost me slightly.  I

13 thought --

14          MR. WARNER:  Okay.  Sure, sure, sure.

15          THE COURT:  I want to make sure I say this correctly.

16 Data material or material data?  What --

17          MR. WARNER:  The material safety data sheets.

18          THE COURT:  Material safety data sheets.

19          MR. WARNER:  Correct, correct, correct.

20          THE COURT:  He's -- he wants to give you those;

21 correct?

22          MR. DE LA GARZA:  Correct.

23          THE COURT:  And that's good.

24          MR. WARNER:  Yeah.

25          THE COURT:  So, what else do you need aside from

1   those --

2              MR. WARNER:  Sure.  Well, okay, but --

3              THE COURT:  -- to -- there's -- there's another

4   issue which you didn't quite address and that's hooking up --

5   let's use the general term skin rash that -- that perhaps the

6   product they -- perhaps they have data as to whether their

7   product causes or could cause skin rash.  Are you looking for

8   that and why wouldn't that be in the material data safety

9   sheet?

10             MR. WARNER:  Okay.  Well, certainly, it would be --

11             THE COURT:  Material safety data sheet.

12             MR. WARNER:  That -- that -- that is the type of

13  information --

14             MS. HALEY:  MSDS is usually how --

15             MR. WARNER:  Right.  That --

16             MS. HALEY:  -- they refer to is.

17             THE COURT:  Say that again?

18             MS. HALEY:  MSDS.

19             MR. WARNER:  Right.  That -- that is the type of

20  information that would be in a material safety data sheet.

21  Leukemia --

22             THE COURT:  So if you get that, you should have what

23  you're looking for.

24             MR. WARNER:  Well, yes and no.  So -- so --

25             THE COURT:  Well, let me hear -- just let me -- let

Colloquy                                    21

1   me -- it's yes and the no is maybe the old ones didn't have

2   everything.  Right?

3           MR. WARNER:  Boy, I -- may I -- I think I -- may --

4   may I --

5           THE COURT:  Sure, sure.

6           MR. WARNER:  -- may I -- let me -- let me -- let me

7   try and frame this.

8           THE COURT:  Okay.

9           MR. WARNER:  Leukemia has a lot of symptoms.  Right?

10  Like right now, for example, my client has necrosis.  We're

11  not even -- we just found out yesterday.  We're not even sure

12  where it is.  Some sort of necrosis, some sort of tissue

13  disorder.  Her -- her skin -- her -- or it's either her skin

14  or part of her body is dying.  Cells are just dying.

15          Leukemia is a disease of many symptoms.  If, for

16  example, one says skin rash, well, and it said that in 1990,

17  you know, or if it said that in 2000, but it didn't say

18  leukemia, we might want to know that.

19          Warning labels, too.  You know, maybe one --

20          THE COURT:  Wait, wait.  Stop with the -- don't do

21  the warning labels.

22          MR. WARNER:  Okay.  Okay.  Okay.  Sure, sure, sure.

23          THE COURT:  I want to stick with this and tell me

24  why the --

25          MR. WARNER:  Sure.  Mm-hmm.

1          THE COURT:  -- MSDS are not enough to let you

2     understand what the other symptoms might be.  I mean, you're

3     going to have to have a doctor look at this, too.

4          MR. WARNER:  Of course.  Of course.

5          THE COURT:  So, isn't this a place to start?

6          MR. WARNER:  What, is -- is Your Honor suggesting

7     that we only would receive the MSDSes from -- from adverse

8     counsel and --

9          THE COURT:  Well, what's the next category of

10    documents that you want?

11         MR. WARNER:  Warning labels on the products where --

12    where the end user can see --

13         THE COURT:  Why shouldn't they get warning labels?

14         MR. DE LA GARZA:  Your Honor, can I ask a question?

15    Just for clarification.  Is counsel talking about the MSDSes

16    for all products or just the one in --

17         THE COURT:  We're talking about the one product.

18         MR. DE LA GARZA:  Okay.  Because I had thought that

19    he had ventured onto all products.

20         THE COURT:  No, we're not going to all products.

21    We're talking about the one product.

22         MR. WARNER:  Well, a warning label is the heart of

23    any --

24         THE COURT:  No, no, no.  MSDS.  One product.

25         Warning labels -- well, why not warning labels?

1          MR. DE LA GARZA:  Pierce has no problem with

2    producing, to the extent that we have them, warning labels

3    that were on the products.  So, all we're talking about is a

4    label that's slapped on the -- the plastic container.  I am

5    not speaking for other --

6          MR. DINO:  Same for Hydrol.

7          MR. DE LA GARZA:  -- defense counsel.

8          THE COURT:  Okay.

9          MR. WARNER:  And oftentimes it's actually just

10   printed right on the bottle, but yeah, but warning labels, for

11   example, --

12         THE COURT:  Okay.  So, warning label.  What's the

13   next category of documents you want?

14         MR. WARNER:  Sure.  Marketing materials.  For

15   example, they -- within -- you know, for -- I believe it was

16   in --

17         THE COURT:  Marketing -- let's go to marketing

18   materials.

19         MR. DE LA GARZA:  There is no issue in this case

20   that turns on the marketing materials.  So, if we produce the

21   material safety data sheets, we're showing what's in the

22   product.  We produce to you warning labels, we're produce --

23   we're showing you what we've disclosed to the user could be

24   the risk associated with using this product.

25         So, marketing materials is a broad request for

1    documents that extends to how that product is marketed in

2    different states and -- and also, I believe this would be

3    request number 3.  Request number 3 is for relating to all

4    defective conditions that existed or you thought exists in any

5    of your embalming products.

6           Now, we've already got past the "any," so we're just

7    talking about all defective conditions.  The problem with the

8    marketing materials simply is the way that it's been requested

9    is over broad and then also there is simply no cause of action

10   that turns on those marketing materials.

11          MR. WARNER:  Well, Your Honor, so at her deposition

12   my client did testify that there were catalogs that she

13   reviewed that were kept at the funeral home, that she believed

14   there was a whole drawer of them.  You know, gee whiz, maybe

15   if one of the catalogs had said warning formaldehyde, she

16   wouldn't -- she wouldn't -- have gotten cancer.

17          THE COURT:  Well, the way you're -- okay.  The --

18   and I understand the argument.  And the way you're arguing --

19   let's -- when I back and read number 3 and then I hear

20   counsel's argument and I hear what you're saying, I do think

21   that there's room here for you to narrow the request.  If you

22   ask for catalogs, I'd likely -- I think they'll produce those.

23          MR. WARNER:  Well, and -- and the other --

24          THE COURT:  Either with my encouragement or not.

25          MR. WARNER:  And -- and, Your Honor, may -- may I?

1   This -- this is -- this is, like, a big industry.  These --

2   these -- these people --

3            THE COURT:  But here's my problem.

4            MR. WARNER:  Okay.

5            THE COURT:  And I don't mean to -- I don't want

6   anybody to get nervous that I said the word "problem."

7            I think we need a little more meet and confer.  I

8   understand you did meet and confer and I under -- because you

9   told me you did, but you need to narrow that down.

10           So, I don't want to sit here for the next 20 minutes

11  and go through everything you would want under 3.  Catalogs, I

12  think is an easy one.  But I want you to go back and think

13  about it and talk to counsel.

14           And I actually see another reason why some of these

15  marketing materials -- he hasn't articulated it here yet, but

16  I am not going to do his job for him and I may be even wrong,

17  so -- so, I'm not -- that's why -- but I think there are some

18  marketing materials that might be relevant to this case under

19  the what we have left in the -- pled in the case.

20           But I do agree that this is very, very broad, so we

21  need to go back to that one.  All right?

22           MR. WARNER:  Okay.

23           THE COURT:  And work a little bit.

24           MR. WARNER:  Okay.  And I -- respectfully, I -- and

25  I'm -- I'm not very optimistic about meet and confer.  I mean,

1   if -- if Your Honor will recall, the last telephone conference

2   Your Honor asked for --

3          THE COURT:  I assume -- well, you need to be more

4   positive about meet and confers.  That's number one.

5          Number two.  Four attorneys here doing their jobs.

6   They just heard what I said.  I don't think they're going to

7   call me back in two weeks and say they've agreed to nothing

8   but catalogs.  I think there's probably other types of

9   documents, but you need to specify which ones and why.  I

10  mean, any and all defective conditions, again, you've kind of

11  put that to the side for a minute.

12         MR. WARNER:  Okay.

13         THE COURT:  We're talking about this disease.  The

14  MSDSes I think is a really great -- I don't know how many

15  there are going to be and how -- you know, I don't think

16  that's a lot;  right?  You've got one product and you have one

17  per year.  Or do they come out more than once a year?

18         MR. DE LA GARZA:  They're not one per year, but we

19  would have multiple iterations.

20         THE COURT:  But how many?

21         MR. DE LA GARZA:  I -- I don't know, Your Honor.

22         THE COURT:  A hundred?

23         MR. DE LA GARZA:  Oh, no, no, no.

24         MS. WEISSLITZ:  No, it's every two to five years.

25         THE COURT:  Yeah, so that's -- it's not -- this is

1  not a burden.

2           MR. WARNER:  Well, --

3           THE COURT:  So, let's start there at least.

4           MR. WARNER:  And --

5           THE COURT:  Catalogs I agree with.  But I don't want

6  to get involved in every little piece of document.

7           MR. WARNER:  Of course.

8           THE COURT:  That's not my job to do that.

9           MR. WARNER:  I -- I -- I understand and I just -- I

10  just wanted to add that, you know, manufacturers will -- will

11  -- will issue different MSDSes for Canada and the EU and it

12  would be interesting to see if, for example, in the EU they're

13  saying, oh, it contains formaldehyde, but in the U.S. they

14  don't.  So, I mean, that's the -- but we'll -- we'll -- I

15  guess we'll meet and confer and hopefully we'll come to a

16  resolution soon.

17           THE COURT:  Well, I just found out my heart -- blood

18  pressure medication, depending in who manufactures it,

19  contains something that will kill me.

20           MR. WARNER:  I hear that, too, Your Honor.  It's --

21  I wasn't -- I wasn't -- I was -- I don't -- I take a different

22  one.  I take Benicar and that's not --

23           THE COURT:  It turned out that I'm okay.  Thank you

24  very much.

25           MR. WARNER:  Yes.

1              MR. DE LA GARZA:  Your Honor, we actually did have a

2    conference, but not with this counsel.  We had it with Mr.

3    Tandy.  And when we had that conference with Mr. Tandy, it was

4    pretty short, because Mr. Tandy basically said he wasn't going

5    to change his position.  He said he would send us a letter

6    laying out his position with regards to our discovery and we

7    haven't gotten that.  So, we have another discovery dispute

8    that's brewing, but, you know, we're -- we're trying to follow

9    the orders of the Court, which is don't bring a problem to you

10   until we've met and conferred.

11             THE COURT:  I understand.

12             MR. DE LA GARZA:  And so we haven't finished that

13   process yet, but, you know, all of our side dedicated time to

14   have the phone conference with Mr. Tandy.  If we now have a

15   conference with this counsel and/or Mr. Tandy, you know,

16   especially guided by your instructions to confer, it probably

17   is going to productive.

18             THE COURT:  And -- well, and always remember, meet

19   and confer, we should -- if I get a chance to write an opinion

20   on this that hopefully changes the rule somewhere, it should

21   say meet and compromise.  Okay?

22             And there are no -- there's always -- I've been on

23   the job for eight years here and there is always room for

24   compromise.  I -- maybe there's -- maybe there's those one or

25   two cases where somebody has been completely unreasonable, but

29

1    generally there's room for compromise.

2            All right.  So, what is the next --

3            MR. WARNER:  Well, I mean, I -- I think the only

4    other next thing is that I think that my adversary -- well,

5    for example, was Pierce -- one -- one of my adversaries -- the

6    one complaining about "any and all" uses "any and all" in

7    their own documents, so I guess --

8            THE COURT:  I thought you worked that out, though.

9            MR. WARNER:  I'm -- we're going to work it out?

10           THE COURT:  I thought he said it was worked it.

11           MR. WARNER:  Well, I -- I didn't -- I thought he --

12           MR. DE LA GARZA:  The way it got worked out was,

13   once counsel, Mr. Tandy, pointed out that some of our requests

14   said any and all, then we no longer objected to that.  So,

15   when we sent a letter to Mr. Tandy laying out what our issues

16   with his discovery were, we raised that with him.  But when we

17   sent a letter to the Court laying out what our issues are, we

18   didn't raise that issue.  When we responded with our responses

19   and objections, we did not make those objections.  And because

20   our view was, you're right, if we used the words "any and all"

21   in this discovery and you used the words, we don't have a

22   basis for complaining about it.

23           The next go around, maybe we would be more careful

24   with how we actually do our discovery.  That's just not an

25   issue here.

1          So, the next issue really is, in our -- in our

2   second grouping, that the plaintiff is seeking access to our

3   formula for our product.  Marketing materials, you know, we

4   need -- we kind of already talked about that.  We're going to

5   have to discuss that further.  Testing, inspection results,

6   some sort of very broadly defined sales materials.  So now you

7   have marketing and sales, probably we'll talk about that.

8          So, I think what we're really talking about is they

9   want -- they want our formula for the product.  They want

10  inspections and testing results.  And not necessarily

11  constrained to whether or not, for example, if you tested the

12  product and it showed that it can cause cancer.  Or you

13  inspected the product and if -- and it was too much, therefore

14  it would cause cancer.  So, we'll start with that.

15         Start with the formula.  I mean, that one right

16  there, you don't need the formula in order to now that the

17  product has formaldehyde.  Nobody contests that the products

18  that are at issue have formaldehyde.  Am I speaking out of

19  turn?

20         MS. WEISSLITZ:  No.

21         MR. DINO:  No.

22         MR. DE LA GARZA:  And so, if we don't contest that

23  and the plaintiff has alleged that, and their claim is it's a

24  simple syllogy, it can -- it's your product, it contains

25  formaldehyde, and I had access and used it and I got sick.

1    And that's the syllogy.

2            So -- and -- and so -- and they don't need the

3    formula to know, for example, if we put particular dyes into

4    it in order to make the skin look rosier.  They don't need

5    that information.

6            MR. WARNER:  Your Honor, that's -- in re -- with

7    respect to my counsel, it's a bit of a silly syllogy, because

8    what I've learned is that there is synergy usually between

9    these chemicals.  So, for example, we flew in a toxicologist

10   from Berkeley last time -- the last time we had a case like

11   this and oftentimes formaldehyde, the -- the toxin -- toxic

12   effect of it may increase when it's combined with another

13   substance.  Not being a toxicologist and not knowing the

14   formula, we just don't know.

15           But so I -- I just (indiscernible chuckling while

16   speaking) alliterations (indiscernible) you know, for -- as

17   far as the syllogy goes, there's a synergy that has to be

18   considered.  And I think that, you know, if our toxicologist

19   examines it, I think -- I think we'll be -- but -- but, you

20   know, as far as -- as far as anything as a trade secret or

21   something, I don't see where there couldn't be a

22   confidentiality or something to that effect.

23           MR. DE LA GARZA:  That's not a claim that's been

24   alleged, that there has been any aggravation by other

25   ingredients.  The allegation is it contains formaldehyde,

Colloquy                                                           32

1    formaldehyde makes you get cancer, and that's it.

2            MR. WARNER:  Well, --

3            THE COURT:  I understand, but there -- I am not

4    shocked --

5            Can we -- can you do me a favor?  Can you push that

6    microphone down it's, like, right between your eyes and my

7    eyes.  Thank you.

8            I am not -- I don't think it constitutes a fishing

9    expedition to know the -- to know the formula so that their

10   toxicologist can ultimate -- so that their toxicologist can be

11   in a position one way or the other to determine whether the

12   product that you sold to his client's employer was dangerous

13   because it contained formaldehyde mixed with X.

14           That's the -- I understand that's not a specific

15   allegation in the complaint, because I think probably because

16   he could never make that allegation, because they don't have

17   the formula and they only know it's formaldehyde.  So, --

18           MS. WEISSLITZ:  Your Honor, if I may?

19           The MSDSes, as well as the labels, they contain all

20   the chemicals in the products.  The specific formula relative

21   to the percentages, I would argue that that's proprietary and

22   I would argue that plaintiffs' expert, through the document

23   production, has everything they need to make the analysis that

24   plaintiff is requesting.

25           THE COURT:  Well, then maybe this is --

1        MR. WARNER:  But --

2        THE COURT:  Let's -- if your expert -- if you come

3   back and make an argument that I find persuasive that you need

4   the percentages, based on science that your expert will tell

5   us why you need the percentages, then maybe I'll reconsider

6   that.  But why isn't that good enough?

7        MR. WARNER:  Well, for example, so may -- maybe if

8   they're willing to stip -- well, our last -- our last

9   formaldehyde client smoked for -- for 20 or 30 years and

10  everyone was -- everyone's hair was on fire, oh my god, he

11  smoked for 20 or 30 years, there's a synergistic effect.  It

12  turns out that there are studies that if he had only smoked

13  for ten years it wouldn't have been that bad of a deal, but

14  now, since he smoked for 20 years, well -- well, you know, you

15  -- you can forget about -- you know, that's comparative

16  negligence right there.

17        So, percentages do matter.  I mean, I -- you know, I

18  was -- I've been down -- you know, I've done enough of these

19  toxicolo -- tox -- toxic tort --

20        THE COURT:  What you're saying sounds logical to me,

21  but I don't think I have enough in front of me -- well, let's

22  back up for a minute.

23        What harm -- what actual prejudice would you suffer

24  by turning over the formula, assuming we have a discovery

25  confidentiality order and it's -- and, you know, whoever can

34

1   view that formula, it's restricted to that and there's all

2   kinds of protections, as we normally have in federal court?

3   And we have them in patent cases and we have them in antitrust

4   cases, we have them in class actions, so I'm sure that we can

5   have one here.  So, how are you prejudiced by turning over the

6   formula?

7            MR. DE LA GARZA:  Your Honor, if you were to provide

8   all of the protection that you just said, then you probably

9   have ameliorated almost all of those risks.  You know, we

10  wouldn't want, for example, to -- to be able to have our

11  defense counsel see our formula and they wouldn't want us to

12  see their formula.

13           THE COURT:  Yeah, I -- I thought about that.  That's

14  the problem we have to deal with.

15           MR. DE LA GARZA:  But I --

16           THE COURT:  Because you're not going to be able to

17  use their formu -- it's going to -- this could get very tricky

18  and very dangerous -- but, I'm sorry, I interrupted you.  Go

19  ahead.

20           MR. DE LA GARZA:  No, well, that -- that's the

21  point, really, and -- and I think you were onto the right

22  track, which is before we get into what is a sticky area,

23  let's see if we need to be in a sticky area.  Is there any

24  proven reason why we need to get into this sticky area?

25           So, I would suggest to the Court that where you were

1   headed is the right way to go, which is we produce our

2   material data safety sheets, that tells you what the

3   ingredients are, he has an expert.  If his expert can make a

4   showing which he presents to the Court for why that's actually

5   necessary, then the Court can entertain that request at that

6   time.  Then we can deal with all these complicated issues

7   between us.

8            THE COURT:  It's conceivable -- I'm not saying

9   probable, I am not saying likely, it's conceivable that your

10  toxicologist is going to look at the ingredients and say it

11  doesn't -- none of these, under any science I know, have any

12  effect of making it worse.

13           MR. WARNER:  Have we even established that these are

14  trade secrets?  Are they?  Are they?

15           THE COURT:  I'm sure they're trade -- I --

16           MR. DE LA GARZA:  It's not publicly disclosed

17  information what --

18           THE COURT:  If each one of these defendants --

19           MR. DE LA GARZA:  -- percentages there are --

20           THE COURT:  -- has a different formula for their

21  embalming products, I think that's a trade secret.  But if you

22  really want to contest that, you are within -- I'll put the

23  burden on them to tell me why it's a trade secret and then

24  I'll -- but we're not there yet.

25           MR. WARNER:  Okay.

 1              THE COURT:  We're not there.  I think this is the

 2    way to go.  Have your tox -- I assume you already have a

 3    toxicologist.

 4              MR. WARNER:  Yes, and --

 5              THE COURT:  Have your toxicologist look at the

 6    MSDSes and -- and if he -- and you make an argument to me -- I

 7    mean, first of all, you're going to talk to them.

 8              But there  is an issue, and I've faced it in this

 9    court before, now we have attorneys' eyes only, but I think

10    you mean scientists.  Maybe I'm wrong.

11              MR. WARNER:  And we'll pay him another couple grand

12    to look at them and look at it again -- look at it again, I

13    guess.

14              THE COURT:  Well, I don't know if you've got to pay

15    him a couple of grand.  I mean, it sounds like this -- it's a

16    one page sheet or is it 50 page document?

17              MR. WARNER:  Well -- well, if you go from -- from

18    1990 when for she -- when she first started working and if we

19    are allowed to get the ones from Canada and the EU, as well, I

20    mean, we're -- we're talking about a lot of stuff, especially

21    with Dodge.

22              THE COURT:  Well, they're going to produce it, so

23    you've got to review it, so I'm not --

24              MR. WARNER:  Well, our toxicologist is going to be

25    the one that's going to be looking at.  I mean, that's --

1            THE COURT:  But now -- I understand, but -- but this

2    is a -- this is the case you chose.

3            MR. WARNER:  Yeah, of course.

4            THE COURT:  So, you have to --

5            MR. WARNER:  I -- I just --

6            THE COURT:  -- you have to go through it.

7            Now, so, where are we?

8            MR. DE LA GARZA:  So, we have talked about formula,

9    Your Honor.  The next related are -- requests are they're

10   requesting documents that refer to the processes involved in

11   the production of the products, the tests that anyone

12   performed on the products, not limited to any particular kind

13   of test, particular purpose, and documents referring to any

14   inspections anybody ever performed on the products not related

15   necessarily to this particular condition that's at issue, --

16           THE COURT:  You're going to narrow all that down;

17   right?

18           MR. WARNER:  Well, Your Honor, I mean, I think

19   testing of these products -- it goes toward when they first

20   learned formaldehyde was --

21           THE COURT:  Oh, I think I am going to give you

22   inspections and testing results, but the question is which

23   testing and which inspections.  You're talking about anything

24   that's got the word -- and I'm being simplistic here, I'm not

25   locking you into this -- but we're talking about things that

1    result in cancer or leukemia.

2              MR. WARNER:  I -- I -- Your Honor, I -- I thought

3    that was implied, but I guess it's not, so that's why we're

4    here.  I thought for -- I -- with respect, I thought it was

5    implied.  I mean, it -- if they wanted to answer under

6    objection saying over broad, we're not going to give you stuff

7    that's a test about the air quality and the -- and, you know,

8    or -- well, that might actually be (indiscernible) -- but a

9    test about the acidity level or something or -- you know, then

10   that's fine, then -- then at least we can do that, but I -- I

11   mean, I thought this was implied.

12             THE COURT:  All right.  Well, apparently it wasn't,

13   so --

14             MR. WARNER:  I -- I don't see --

15             MR. DE LA GARZA:  Well, the --

16             THE COURT:  Do you still object once we've narrowed

17   it down?

18             MR. DE LA GARZA:  Well, what I would -- I would say

19   we have to figure out how to narrow that down in order to make

20   that relevant.  So, for example, my client -- when I talked to

21   my client about, well, what kind of testing or inspection

22   might you do?

23             THE COURT:  Mm-hmm.

24             MR. DE LA GARZA:  And it's a chemical production

25   process.

Colloquy                                    39

1          THE COURT:  Mm-hmm.

2          MR. DE LA GARZA:  So, the ultimate test is when you

3    get it out at, you know, at the end of the, in effect, the

4    assembly line, then you look at what you've got to see if it

5    has the right percentages, in terms of --

6          THE COURT:  Does it work?

7          MR. DE LA GARZA:  -- of the chemicals.  And then

8    does it have the right look, does it have the right smell.

9    Whatever all those things are that they're testing.  That's

10   what they're doing.  Those are more of the appearances, the

11   composition, as opposed to something that would relate to --

12         THE COURT:  The efficacy of the product.

13         MR. DE LA GARZA:  Yeah.

14         MR. WARNER:  And -- and if they're to --

15         MR. DE LA GARZA:  As opposed to the whether or not --

16         THE COURT:  Whether it causes cancer.

17         MR. DE LA GARZA:  -- it would cause cancer.  So, if

18   you were to say, --

19         THE COURT:  Well, --

20         MR. DE LA GARZA:  -- you know, a test for the color,

21   nothing to do with this lawsuit.

22         THE COURT:  Yeah, but how burdensome -- I don't --

23   you haven't told me, I don't think, how burdensome it is.  I

24   don't know how many -- the way you just described it sounds

25   logical to me, that they have a quality assurance guy come in

1  at some -- maybe every day, maybe once a month, maybe every

2  run, I don't know, but whatever they do they do and -- and

3  they test it and then they put the test results in the file.

4  Right?

5              MR. DE LA GARZA:  Right.

6              THE COURT:  And maybe it only tests for color,

7  smell, degree of formaldehyde, whatever.  And it -- but it

8  says nothing about disease causing, because that's not what

9  they're testing it for.

10             MR. DE LA GARZA:  Correct.

11             THE COURT:  Okay.  First of all, just so that

12 counsel has done his job and we don't have a problem later on,

13 why would you not produce at least a sampling of those to show

14 this is what we do on a regular basis?  And maybe do one from

15 every decade or something.  Or --

16             MR. DE LA GARZA:  I wouldn't have a problem with

17 producing a sample of a test so that counsel could see what

18 are we testing.

19             THE COURT:  And --

20             MR. DE LA GARZA:  And I don't speak for all of the

21 defendants, but that -- that is --

22             THE COURT:  But we also want to make sure, --

23             MR. DE LA GARZA:  -- more -- less burdensome.

24             THE COURT:  -- because we're talking about a long --

25 talking about a long period and we want to make sure that

Colloquy                                                41

1  whenever the type of testing changed, you're getting a sample

2  of the new test.

3           MR. DE LA GARZA:  Right.

4           MR. WARNER:  So -- oh, I'm sorry.

5           THE COURT:  Just let me finish.

6           MR. WARNER:  Forgive me.  Forgive me.  I'm sorry.

7           THE COURT:  Okay.  So, that's -- it's more of a take

8  it out of the case thing than it is giving them ammunition.

9           MR. DE LA GARZA:  So, what I think we're talking

10 about is an example of a test during the time period defined

11 by the lawsuit, and to the extent that the test changed, then

12 an example of the next test.

13          THE COURT:  Right.

14          MR. DE LA GARZA:  If the format changed or the

15 actual test changed, --

16          THE COURT:  Mm-hmm.

17          MR. DE LA GARZA:  -- then we give them an example of

18 that one.  So, example for -- of each test that would have

19 been performed, each inspection that would have been

20 performed.

21          THE COURT:  Yes.

22          MR. DE LA GARZA:  So he could decide do I want more.

23          THE COURT:  Exactly.  I'm not --

24          MR. DE LA GARZA:  Fair?

25          THE COURT:  -- foreclosing your right to say this is

1   going to take us down a path to now right to the heart of the

2   lawsuit.

3         MR. WARNER:  And -- and I -- and I -- and that's

4   fair, Your Honor, and I -- I -- I would only say if -- if the

5   discovery had been responded to under the objection, then we --

6   we probably wouldn't even be here right now saying that, you

7   know, --

8         THE COURT:  All right.  Well, you're here.

9         MR. WARNER:  But -- but that -- but that -- but, you

10  know, actually, though color and smell, you know, sometimes

11  she didn't take her (indiscernible), sometimes it was already

12  in the machine, and it could have been a certain shade of red

13  and that's how she may have identified a certain product.  I

14  mean, you know, so stuff -- stuff -- stuff like that is

15  certainly relevant, as well, but --

16        THE COURT:  All right.  I'm not say --

17        MR. WARNER:  -- you know, --

18        THE COURT:  -- but you're going to get that under

19  any -- you're going to get that.

20        What's the next area?  And by the way, you said

21  something that we didn't addressed.  You talked about

22  processes.  And I don't know why that's relevant, so I'm going

23  to say no to the processes.  Until you tell me why you need to

24  know exactly how they make their product.  You're going to

25  know what is in their product, you're going to know what

1   testing -- they performed on the product.  You're going to get

2   certain marketing materials on the product.  You're going to

3   get the catalogs.  I don't know why the processes are

4   relevant.

5           MR. WARNER:  Well, the -- well, let's -- let's say

6   did their workman's comp insurance come in and say these

7   people are working with formaldehyde, make them wear the --

8   make them wear the cartridge respirators.  That goes to

9   process.

10          THE COURT:  Well, yeah, but that's totally

11  different.  I don't know enough about this, but speculating,

12  raw formaldehyde here, product over here.  I could see why a

13  guy handling it over here might need more than your client

14  over here.

15          MR. WARNER:  Well, I mean, I think that if you -- if

16  you have a plant that has a vat of raw formaldehyde that's

17  being poured into other substances, then that -- then I --

18          THE COURT:  That may very well be dangerous, --

19          MR. WARNER:  I -- I -- I --

20          THE COURT:  -- but that's not your case.

21          MR. WARNER:  Well, exactly, but if we knew, for

22  example, that, you know, this -- that -- that one defendant

23  had -- required all of its employees to don a cartridge vest --

24  respirator before going to the assembly line, well, then we

25  would say, well, heck, why the heck didn't it say in your

1    material safety data sheet that they should have done that,

2    too?

3             THE COURT:  Because it might be totally different at

4    the other end of the assembly line.  I don't --

5             MR. WARNER:  Well, you're -- I think what Your Honor

6    is saying, that an embalming room might be different than an

7    assembly line may in a --

8             THE COURT:  Yeah.

9             MR. WARNER:  -- in a factory.

10             THE COURT:  Yeah.

11             MR. WARNER:  Well, that may be so, but we're --

12    we're never going to know though unless we know what the

13    process is.

14             THE COURT:  Well, you can think about this one and --

15    and I understand where you're going.  Right now, I am not

16    seeing it.  You've got to give me a little bit more on the

17    connection between protecting the worker in the factory

18    handling raw -- I'm assuming raw formaldehyde, whatever that

19    means; I'm just making that up -- with an embalming product

20    that they have a responsibility to make sure can be used

21    safety under FDA reg -- is it FDA?

22             MR. WARNER:  F -- it' s everything, Your Honor.

23    EPA, FDA, all -- it -- I mean, it --

24             THE COURT:  Under government supervision.

25             MR. WARNER:  Well, so -- so that's why we -- we

1   would need to know the -- the parts per million in the factory

2   and then the -- we can compare it with the parts per million

3   in the embalming room.

4              THE COURT:  I -- but only if you're going to -- if

5   you're representing a worker who has come down with cancer in

6   the factory.

7              MR. WARNER:  Yes, but except for the -- well, let's

8   say the parts per million is equal or even less than the parts

9   per million in the -- in the embalming room and everyone on

10  the assembly line has a cartridge respirator, but nothing in

11  the warning label or the MSDS says you've better put on a

12  cartridge respirator.  I think a jury would -- should hear

13  that.

14             THE COURT:  We're going to say no for now.  I need

15  more information after you've gotten everything that you've

16  got.

17             MR. WARNER:  Can I at least have the parts per

18  million at least in the factory?  Because I think that would

19  at least --

20             THE COURT:  Can you have what?  I'm sorry?

21             MR. WARNER:  Can I have the parts per million in the

22  factory that -- because, I mean, these are things that we've

23  been asking for and they all -- they all sort of meld

24  together.  They -- they -- they're all -- I --

25             THE COURT:  Why can't you give him the parts per

Colloquy                                        46

 1  million in the factory --

 2            MR. WARNER:  I --

 3            THE COURT:  -- or whatever that means?  I --

 4            MR. WARNER:  Well, parts per million in the -- in

 5  the air.

 6            THE COURT:  I know what you mean.  I didn't mean

 7  what you mean.  I wasn't --

 8            MR. WARNER:  Having the --

 9            THE COURT:  I wasn't trying to be snotty about the

10  way you said it, I'm just -- it hasn't been scientifically

11  defined to me yet.

12            MR. DE LA GARZA:  I think counsel is creating a

13  scenario, in order to defend his request, that doesn't exist.

14  There is no measurement in the factory of parts per million,

15  for example, in the air.  That's just not being measured.

16            And I am going to make an assumption here that there

17  is some sort of respirator or there's some sort of clothing

18  and all that that's used in the factory.  And I do agree with

19  the -- the proposition that what happens in the factory is not

20  the same setting as what happens over in the embalming room.

21  You're using one small container of the fluid, as opposed to

22  maybe being standing next to a vat of the same stuff.

23            And so, unless some scientist says that there is

24  some direct correlation between the experience of the worker

25  in the factory and the experience of the embalmer, I don't see

1  how -- how that could ever be relevant, could -- and could

2  ever turn into anything relevant.

3          THE COURT:  Yeah, where -- you're trying to make

4  this case too big.  This is a case about what happened to your

5  client after being exposed to these products over a period of

6  time and that's -- and that's what's in this case.  But to try

7  to go back and find out how dangerous it may or may not have

8  been in the factory and what precautions they took in the

9  factory is -- is I think relevant in a very esoteric sense of

10  the word.

11          MR. WARNER:  May -- may -- may I just respond?

12          THE COURT:  Yep.

13          MR. WARNER:  To my adversary?

14          So, it -- it's not just one bottle, you're actually

15  taking the blood out of somebody, which is a lot, and putting

16  it -- and replacing it with fluid and it's -- it's a -- a

17  factory presumably is a much -- is a large facility with open

18  air, whereas an embalming room -- and we've all visited them --

19  is -- is probably the size of Your Honor's chambers.

20          So, I -- I -- again, I would --

21          THE COURT:  So, they're not the same.

22          MR. WARNER:  Well, they're not -- well, very, very

23  few things are exactly the same in our line of work, Your

24  Honor, respectfully, but I -- I just think that I -- I think

25  this was a request that we succeeded on in state court, simply

1   because if -- you know, if -- if what's good for the goose is

2   good for the gander.  If -- if you -- if you -- if you're

3   trying to avoid workers' comp suits, because you want your

4   worker being -- you know, you -- you don't want to get sued,

5   you know, you -- you don't want -- you want to make sure your

6   worker -- there's worker safety and O -- when OSHA slips by,

7   you don't get fined, and -- and there's nothing in your MSDSes

8   that says otherwise, then I -- I -- I think what's good for

9   the goose is good for the gander.

10          MR. DE LA GARZA:  I don't even really --

11          THE COURT:  Give me one second.  Please.

12          MR. DE LA GARZA:  -- know how to respond to that.

13          THE COURT:  Give me one second.

14                  (Extended pause)

15          THE COURT:  All right.  Go ahead.

16          MR. DE LA GARZA:  Well, I was simply saying, Your

17  Honor, I don't really understand what counsel was just saying.

18  I don't really understand his argument.  I think that we've

19  already made the point these are totally disparate situations.

20  There's -- there's just simply no relevance to it.

21          Counsel keeps on making references to the MSDSes and

22  they should make disclosure that you need protective

23  equipment.  Well, the reality is they do.  That's not being

24  raised here.  And, you know, at some point we'll probably have

25  the proper setting to show you all the MSDSes, to show you the

1    labels.  And we also don't have the benefit of presenting to

2    you the testimony of Patricia O'Connor with regard to the fact

3    that she did use protective equipment and protective clothing.

4           So, you know, we're -- I think we're getting way

5    ahead of ourselves in discovery.

6           THE COURT:  I don't think you briefed this issue.

7           MR. WARNER:  Well, --

8           THE COURT:  And that's why I stopped for a minute,

9    to go back and look at your letter.

10          MR. WARNER:  I -- I -- I think -- I think what --

11   what -- in our -- well, first -- first of all, the protective

12   equipment changed dramatically since 1990 when Patricia

13   O'Connor started working.

14          In our -- in our letter, Mr. Tandy -- you know, I'm

15   not -- I'm not jumping on him, but he -- I -- I -- and I --

16   actually, he and I both worked on it.  Basically, what we're

17   saying is process is process.  Process is -- or, you know,

18   maybe we should have said process -- maybe we could have been

19   more specific, but, frankly, I mean, you know, we just -- we

20   just figured that, you know, these are -- these are defendants

21   that represent sophisticated enough clients as to certain --

22   certainly -- certainly these things should simply just be

23   implied.

24          I mean, I -- I -- I don't -- not -- not -- very

25   rarely is anything in our profession the same.  We're lucking

1   if it's similar.  And in this case, if we have -- if we have a

2   factory owner who goes, oh my god, what if OSHA comes by and

3   I'm not -- I'm -- and I'm -- you know, and I'm -- and I'm --

4   I'm done -- I'm done with, or if my own -- my -- my workers'

5   comp insurer stops by, I'm done with, I mean, everyone better

6   put on your -- your -- your respirators, you know, and -- and

7   -- and it --

8            And, again, this changed dramatically over the past

9   several decades.  When Patricia O'Connor started, I think they

10  were lucky if they -- if they wore surgical masks.  And -- and

11  these are things I learned from toxicologist in my last suit.

12  It's -- it's --

13           THE COURT:  Well, that -- it -- you know, that's

14  going to depend on whether or what the state of the art and

15  the knowledge was at the time.

16           MR. WARNER:  Well, and how are we going to know that

17  though unless, you know, we know what their process --

18           THE COURT:  Well, you're going to get everything to

19  tell you what it was for that.  You're arguing now that you --

20  that they have to open up their factory floor to you --

21           MR. WARNER:  Well, --

22           THE COURT:  -- and I --

23           MR. WARNER:  I have no desire to go there, I mean, --

24           THE COURT:  No.  All I'm saying is right now I am

25  not seeing that relevance, nor do I think that -- and I want

1    you to understand what I am saying here.  I am not shutting

2    this down forever and for all time.

3              MR. WARNER:  Uh-huh.

4              THE COURT:  I am not denying it with prejudice.

5              MR. WARNER:  Sure.

6              THE COURT:  But I am denying it today and I -- and

7    that's why I went back and looked at your letter.  I don't

8    think you've really argued this why you need to go that far

9    that way.

10             MR. WARNER:  I -- I just -- and well, I -- I suppose

11   I don't think we -- we expected this much resistance.  Again,

12   I -- I mean, you know, these are -- these -- you know, Ms.

13   Weisslitz knows, she's represented a lot of the toxic

14   companies, and I -- I -- we -- we -- we --

15             THE COURT:  And this is something you always get?

16             MR. WARNER:  -- we -- we -- we --

17             THE COURT:  You always get the --

18             MR. WARNER:  No.

19             THE COURT:  -- the processes and the manufacturing?

20             MR. WARNER:  We got it last time, yeah.  I mean, I --

21   if my recollection serves me correctly, I think we got

22   everything from OSHA, we got OSHA testing, we got -- I mean,

23   good lord, we got quality air sampling in the company, oh,

24   they've -- you know, they've -- they were sure to do that.

25   Because qual -- and I -- again, if we want to wait for

1    toxicologist, that's fine, but nowadays --

2              THE COURT:  How did you get it from OSHA?

3              MR. WARNER:  I'm sorry?

4              THE COURT:  Did you -- how did you -- last time,

5    wherever that was, how did you get it from OSHA?

6              MR. WARNER:  I don't think even it was a motion or

7    anything, was it?

8              THE COURT:  No.  Did you subpoena it from OSHA or

9    did you get it from --

10             MR. WARNER:  Oh, oh, it was -- it was --

11             THE COURT:  -- your defendants in --

12             MR. WARNER:  -- it was a FOIA.  It was a FOIA

13   request.

14             THE COURT:  Okay.  Well, why don't you do that?

15             MR. WARNER:  Well -- well, because I -- well, --

16   well, so let me -- let me back up a little bit.  OSHA only has

17   things when there's a problem.  OSHA requires certain testing,

18   nevertheless even when there's not a problem.

19             THE COURT:  Right.

20             MR. WARNER:  OSHA requires testing in factories.

21   OSHA requires testing in embalming rooms.  OSHA requires all

22   sorts of crazy stuff now and --

23             THE COURT:  Okay.

24             MR. WARNER:  -- and it changed all over the decades.

25   And -- and I guess I -- I just thought -- I just saw -- and --

1   and I'm -- and please forgive me, guys, I am not trying -- I

2   just thought a lot of this was implied, that's what -- but --

3   but let me be more specific.  That's fine.  I mean, we'll make

4   it more specific.  That's -- we'll -- we'll per --

5              THE COURT:  Either --

6              MR. WARNER:  -- we'll confer.

7              THE COURT:  -- make it more specific --

8              MR. WARNER:  Yeah.

9              THE COURT:  -- and/or --

10             MR. WARNER:  Yeah.

11             THE COURT:  -- brief it more specifically --

12             MR. WARNER:  Okay.  Okay.

13             THE COURT:  -- and/or go to -- get a FOIA request

14  from OSHA.

15             MR. WARNER:  But -- but again but the only --

16             THE COURT:  Send out a FOIA -- send out a FOIA --

17             MR. WARNER:  -- the only problem with that though is

18  that the -- you know, you only get them when there's a

19  problem.  So, maybe in 1997, you know, a vat spilled and they

20  were --

21             THE COURT:  Well, before we go down that road, be

22  more specific in this --

23             MR. WARNER:  Okay.

24             THE COURT:  -- particular request.  Okay?

25             MR. WARNER:  You got it.  Yeah.  Thank you.

1          THE COURT:  I need you to make a more coherent

2    connection.

3          MR. WARNER:  Understood, Your Honor.  Well, you mean

4    -- you mean briefing to Your Honor or --

5          THE COURT:  Yes.  Well, see if you can work it out.

6          MR. WARNER:  Okay.  Okay.

7          THE COURT:  But if not, --

8          MR. WARNER:  Okay.

9          THE COURT:  -- if you can't work it out, I'm --

10   before I was saying --

11         MR. WARNER:  Okay.

12         THE COURT:  -- simply saying you need to meet and

13   confer and I know you're going to be successful.  On this one,

14   meet and confer, but if you're not successful right away, send

15   me a more detailed letter --

16         MR. WARNER:  Understood, Your Honor.

17         THE COURT:  -- as to why this is relevant to your

18   claims and defense -- your claims in this lawsuit or their

19   defenses.

20         MR. WARNER:  Absolutely.

21         THE COURT:  Okay.  Next?

22         MR. DE LA GARZA:  We have one more area, Your Honor,

23   but I did hear counsel in that prior discussion make a

24   reference to EU regulations, you know, Canadian regulations.

25   Well, we're in the United States.  This is in New Jersey.  We

Colloquy                                    55

1   certainly want to make sure that we're not required to produce

2   any documents that are outside of the United States.

3            I've had -- we didn't even know we had an issue

4   about that until I heard all of this discussion of EU and

5   Canada, because it's not in any discussion we've had up to

6   this point.

7            THE COURT:  Mm-hmm.

8            MR. DE LA GARZA:  So, all right.  The next area is

9   there are requests for us to provide what we consider to be

10  attorney work product, pure litigation related files --

11           THE COURT:  All litigation files, number 15?

12           MR. DE LA GARZA:  -- relating to other matters.  And

13  so the first one though, it's in request number 12.  They ask

14  for each and every law which governs any aspect of the chain

15  of distribution of the products the subject of this

16  litigation.  So, they want us to -- to make copies of the laws

17  that we think are relevant to the chain of distribution.  Our

18  client is not going to have that.  That would be something

19  that either they receive from a lawyer -- there are no -- we're

20  -- we're not legal firms, we're chemical manufacturers, and so

21  it's either going to come from a lawyer, which is attorney-

22  client privilege, or it's going to ask us to make that

23  decision of what is that applicable law related to the chain

24  of distribution.

25           There is no need for this and, frankly, that's just

1   all attorney work product.  So, that was number 12.

2           Number 15 asks for litigation files related to other

3   lawsuits since 1990.  And that would be attorney work product,

4   as well, and frankly not relevant.  This case is not going to

5   be decided based upon how another case went.  That's a pure

6   fishing expedition.

7           And then number 16 asks for documents that refer to

8   complaints about products -- so, number 16.  Every document

9   that refers to a complaint concerning the products in

10  litigation.  Okay.  Well, that's not narrowly constrained to

11  the facts of this case.  If, for example, somebody sent us a

12  complaint and said the box was damaged or this gives me the

13  wrong color, it's not the rosy pink that you advertised, it's

14  the red rose and I can't sell that, that's just not cons --

15  narrowly tailored to the needs of this case.

16          So, those are -- that's the next category, 12, 15

17   and 16.

18          THE COURT:  All right.  Number -- let's go in

19  reverse order.

20          MR. WARNER:  And may I?

21          THE COURT:  Sure.

22          MR. WARNER:  Okay.  Well, again, I thought this was

23  implied.  I mean, if they had just simply answered under an

24  objection we're not going to give you complaints about a torn

25  box, that would be perfectly acceptable.  But it somebody

1   writes back and says, you know, I -- I got a severe skin

2   irritation or, you know, and for all -- you know, look.

3          THE COURT:  Let's start this way.

4          MR. WARNER:  Mm-hmm.

5          THE COURT:  They'll give you all complaints -- and

6   we'll talk about what that means in a minute -- all complaints

7   about cancer or leukemia.

8          MR. WARNER:  Fair enough, Your Honor.

9          THE COURT:  Now, what do you mean by complaints?

10         MR. WARNER:  Well, I --

11         THE COURT:  Because here's the thing.  I don't know

12  -- and I don't know if you've -- I'm sure you do know,

13  actually, the answer to this question -- is how your clients

14  record consumer complaints, whether they record them.  I mean,

15  I'm sure they do.  How and how voluminous they are.  Whether

16  they can be broken down by cancer slash leukemia.  And that's

17  one form of complaint, and then the other are litigations.

18         MR. WARNER:  Right.  I --

19         THE COURT:  I mean, that you should have a record

20  of.  How many times you've been sued by any consumer or

21  anybody where the allegation is that your products cause

22  cancer or leukemia.  I know cancer is a little broader, but

23  I'm going to go there.

24         MR. WARNER:  I -- I -- and I don't want -- I don't

25  want their work products, Your Honor.  I don't want their

1   memoranda about, you know, how -- you know, how --

2             THE COURT:  No, well, okay, but let's just do one

3   thing at a time.

4             MR. WARNER:  Okay.  Oh, --

5             MS. WEISSLITZ:  Your Honor, I just want to make

6   clear that we're talking about embalming fluids.  These are

7   not products that are marketed or used by --

8             THE COURT:  No, I know that.

9             MS. WEISSLITZ:  -- everyday consumers.

10            THE COURT:  When I use the word consumer, I mean

11  somebody who bought your marketing product.

12            MS. WEISSLITZ:  Yeah, and there -- and there's not --

13            THE COURT:  I mean, not marketing product, --

14            MS. WEISSLITZ:  -- and there's not, like, --

15            THE COURT:  -- your embalming product.

16            MS. WEISSLITZ:  -- a hotline where people call up

17  and say, --

18            THE COURT:  Well, I didn't know if there was or

19  there wasn't.

20            MS. WEISSLITZ:  Well, I can speak for my client that

21  there's not.

22            THE COURT:  Okay.

23            MS. WEISSLITZ:  And so we have no problem disclosing

24  prior litigations.  I believe, at least for my client, Mr.

25  Tandy and Mr. Warner have that information, so --

1          THE COURT:  Okay.

2          MR. WARNER:  Well, again, Ms. -- Ms. Weisslitz

3   (indiscernible) the Website, the address, I mean, you know, --

4          THE COURT:  Hmm?  What?

5          MR. WARNER:  -- they -- they have a -- they have a

6   Website.  I believe their Website allows the people to --

7          THE COURT:  Well, I'm not going to argue that now.

8   I want you to make -- answer the question as to how your

9   client logs in -- if -- whether and how they log in complaints

10  about products.  If they have no complaints or no place where

11  they've kept them, then you can answer that.  If they've -- if

12  there are -- if --

13         MS. WEISSLITZ:  Okay.

14         THE COURT:  If it turns out to be a burdensomeness

15  issue, then you'll let me know.  Otherwise, I think it's

16  relevant.

17         MS. WEISSLITZ:  Okay.

18         MR. DE LA GARZA:  So, if there's a -- if there is a

19  complaint or -- that is non-litigation, we give the complaint,

20  whatever -- the letter or whatever it is, the email, Website.

21  Or if there's litigation, we give them the complaint, the

22  actual petition complaint and we start there.

23         THE COURT:  Right.  We start there.  You'll review

24  that stuff and then, if you want follow up, we'll -- you could

25  talk to them.  And if I have to get involved, I will.

1              MR. WARNER:  Yeah.  And -- and look, if -- if

2    there's something that's -- that -- that was on PACER or

3    something, then I don't need them to print all that stuff out

4    for me.  And then, as --

5              THE COURT:  Well, you'll just -- you know, just give

6    me -- you hear that.

7              MR. WARNER:  Yeah.  Yeah, I mean, you know, --

8              THE COURT:  You don't need to print every complaint

9    out, just give them the information.

10             MR. WARNER:  Right.  And -- and I --

11             THE COURT:  All right.

12             MR. WARNER:  -- and I -- I -- it --

13             THE COURT:  Complete litigation files.  All right.

14   I tend -- well, you don't really want complete litigation

15   files.

16             MR. WARNER:  Fair -- fair enough.  I --

17             THE COURT:  And then number 12.  Well, this

18   question, Mr. de la Garza edited it when he read it.  And I

19   thought his edit -- his edit made some sense, but that's --

20   really, it asks for all -- it's too broad and too convoluted

21   and it asks for too many things in one question.

22             MR. WARNER:  So, I -- I -- I pulled it from -- I --

23   well, I sort of paraphrased it from the New Jersey form --

24   what was it?  C or A interrogatories that asked violation of

25   any and all laws, statutes, regulations.

1              THE COURT:  Mm-hmm.

2              MR. WARNER:  I don't think it's unfair to say --

3    well, laws -- well, you know, --

4              THE COURT:  Each and every law --

5              MR. WARNER:  Or -- or -- or what -- what -- what law

6    are you subject to what -- per regulation.  I -- I don't think

7    that's necessarily unfair to say who are your regulators, who

8    are your overseers, what do they require of you.

9              MR. DE LA GARZA:  Your Honor, this is not an

10   interrogatory.  This is a request for documents.  So, the only

11   way we're -- we would be able to do that would be, as lawyers,

12   we would have to go through that exercise, if required to,

13   print out a law.  That just --

14             MR. WARNER:  I -- I would --

15             MR. DE LA GARZA:  And that would be totally attorney

16   work product, --

17             MR. WARNER:  I would --

18             MR. DE LA GARZA:  -- because we're now having to say

19   what we think --

20             THE COURT:  Well, I don't want to raise an issue

21   that you guys haven't argued about yet here, but the bottom

22   half of the question says "and which was established,

23   published or promulgated by any professional association,

24   trade association, industry association, or private group."

25             MR. WARNER:  I -- I think the one above that talks

1   about regulators.  I think there's another one that talks

2   about regulators.  I think --

3            THE COURT:  No, the same -- it's in the same

4   question.

5            MR. WARNER:  Oh, it is?  Okay.  Well, let's -- I

6   mean, we're -- we're asking who are your overseers and what do

7   they require of you and I -- I look at the -- and I -- I -- if

8   the -- if he wants to make a list instead of printing them

9   out, that's fine, too.  I -- you know, I -- I -- I don't want

10  -- so, I don't think that hitting print is necessarily

11  creating attorney work product, but I'm --

12           THE COURT:  I'm not sure why you're asking this

13  question.

14           MR. WARNER:  Well, I -- again, I  -- I -- I --

15           THE COURT:  If I understand what you're asking, you

16  should know the answer.  Now, I know that's not an appropriate

17  response to a discovery question that you -- that you know it

18  doesn't mean you can't ask it, but this is not something

19  that's in dispute.

20           MR. WARNER:  In

21           THE COURT:  Who the -- who regulates them?  It's not

22  like you're going to get a different answer than you would

23  have expected.

24           MR. WARNER:  Well, so, --

25           THE COURT:  Right?

1          MR. WARNER:  Well, not necess --

2          THE COURT:  Am I right about that?

3          MR. WARNER:  I'm not sure, Your Honor, because, you

4    know, again, the -- these -- I know, for example, Dodge sells

5    internationally and we -- we -- we'd like to know, you know,

6    maybe they -- maybe they take different -- maybe they make

7    their products safer abroad than they do here.  And we would

8    like to know --

9          THE COURT:  They may.  They may.

10         MR. WARNER:  -- what regulations they follow -- they

11   -- they follow.  I mean, and I -- I can figure -- I'll -- you

12   know, we'll -- we'll -- we'll synthesize all that information

13   once we get it.  We'd just like to know, you know, what -- you

14   know, for example, maybe they belong to the --

15         THE COURT:  Well, let's --

16         MR. WARNER:  -- formaldehyde --

17         THE COURT:  Let's take it one step at a time.  What

18   governmental entity regulates them.  You want to know that.

19         MR. WARNER:  Well, --

20         THE COURT:  Even though I think you probably know,

21   at least for the United States.

22         MR. WARNER:  Right.  Sure.  And -- and abroad, yeah.

23         THE COURT:  So, you want to know internat --

24   everywhere they do business, what governmental entity

25   regulates them.  That's number one; right?

1          MR. WARNER:  Yes.  Correct.

2          THE COURT:  And you then you want to know, aside

3    from governmental entities, whether they are regulated --

4    let's -- I'm going to just for purposes of my understanding --

5    whether they're self-regulated by a professional organization

6    or association.

7          MR. WARNER:  Correct.

8          THE COURT:  Okay.

9          MR. WARNER:  And for all I know, there's something

10   I'm completely unaware of, like the International Organization

11   of Formaldehyde Manufacturers, that says, well, you -- you

12   know, that -- that said in 1988, oh boy, this stuff is really

13   starting to get, you know, looked at closely, we better look

14   into safer ways of --

15         THE COURT:  Well, it does sound more like an

16   interrogatory than a document demand.

17         MR. WARNER:  Well, it does -- it doesn't have to be.

18   He could print it out and I don't think hitting print is --

19         THE COURT:  What are they going to print out?

20         MR. WARNER:  -- is making it attorney work product.

21         THE COURT:  What are they -- there is -- I am --

22   what are you asking them to print out?  Like, it's -- that's

23   an interrogatory question.  Who -- to whom do you answer?

24         MR. WARNER:  Mm-hmm.  Right.  Right.

25         THE COURT:  To whom are you regulate -- who are you

Colloquy                                        65

1    -- who regulates you.

2              MR. WARNER:  Mm-hmm.

3              THE COURT:  Governmental -- that's an interrogatory

4    question.  I don't think there's a button somebody pushes

5    somewhere to say here's all our regulators, you have it right

6    here.

7              MR. WARNER:  Well, but I -- but I think --

8              THE COURT:  Or maybe they do.

9              MR. WARNER:  Well, I -- I -- I think -- fair enough.

10   I know -- but I think it could be -- I think they could --

11   they could print out -- and I'm not -- I don't necessarily --

12   I wouldn't require that.  I don't think hitting print is

13   creating attorney work product, but I -- I -- I think that it

14   could be --

15             THE COURT:  Well, --

16             MR. WARNER:  -- a document demand and we're saying,

17   well, what regulations, what -- what -- do you adhere to, what

18   -- what -- perhaps not maybe legally binding, --

19             THE COURT:  Again, those are --

20             MR. WARNER:  -- but what standards.

21             THE COURT:  Those are deposition -- I mean

22   interrogatory questions.

23             I'm not going to make them answer that question.

24   You -- if you can ask it in an interrogatory or in a

25   deposition perhaps --

1            MR. WARNER:  Okay.

2            THE COURT:  -- when you get a 30(b)(6) witness or

3    something.  I mean, I -- I am not telling you that I don't

4    think it would lead -- although this is not the standard

5    anymore -- to admissible evidence.  It may -- it may lead to

6    relevant evidence in this case.  Maybe.  I get it.  I

7    understand how I think you would want to use it, depending on

8    what the answer is.  But let's just ask it in a more --

9            MR. WARNER:  And --

10           THE COURT:  -- in a better way.

11           MR. WARNER:  And just may I just say one more thing,

12   Your Honor?  That -- that -- that I don't know -- that -- that

13   I've deposed enough of these embalming man -- company

14   manufacturers and we have had CEOs know that when I get there,

15   the answer is going to be "I don't know."  Which is why --

16           THE COURT:  Well, you've got to put -- well, if

17   you're going to do a 30(b)(6) deposition, make sure that you

18   put that as one of your topics.

19           MR. WARNER:  Okay.

20           THE COURT:  Who it regulates.  It's a very simple --

21   that's very simple.

22           MR. WARNER:  No, no, I -- right and, well, --

23           THE COURT:  And I think they have probably somebody --

24           MR. WARNER:  Well -- well, the -- the -- also -- I'm

25   sorry.  I didn't mean to interrupt, Your Honor.  I was -- I

Colloquy                                                    67

1    was just -- I was just going to say, you know, the -- well, I

2    don't know who -- who in the EU does it, or I don't know who

3    in Canada does it, I don't know what regulations we're

4    supposed to follow in Canada, I just -- I just -- I'm just Jim

5    Jones from Texas, I -- you know, I just make formaldehyde.

6    You know, that's the answer I get routinely.

7              THE COURT:  Well, you're -- then you haven't given

8    them a proper 30(b)(6) notice.

9              MR. WARNER:  Okay.

10             THE COURT:  Or, if you have, they're violating the

11   hell out of it.

12             MR. WARNER:  Okay.  Fair enough, Your Honor.  Fair

13   enough.  Fair enough.

14             MR. DE LA GARZA:  We do have one remaining demand

15   and that was document demand number 2.  Document demand number

16   2 asks for documents related to possible alternative

17   recommended or foreseeable uses of our products.  So, --

18             THE COURT:  Oh, yeah.

19             MR. DE LA GARZA:  So, that's like saying what else

20   could you do with this stuff?

21             THE COURT:  I don't like that one at all.

22             MR. WARNER:  Okay.

23             THE COURT:  That's out.

24             MR. WARNER:  Okay.

25                        (Extended pause)

Colloquy                                              68

```
 1              THE COURT:  Now, we started talking about the fact

 2    that your client is sick.  And if I didn't make it clear,

 3    you've got your six weeks, you've got your four weeks.  But

 4    how long will you need thereafter -- well, I guess it's you,

 5    really -- to get ready to depose his client?

 6              MS. WEISSLITZ:  After the four weeks?

 7              THE COURT:  Well, just say from today.  I mean, just

 8    step back for a minute and think about what you need to get

 9    there, because if she's getting sicker, we probably need to do

10    something.

11              MR. DE LA GARZA:  So, we have more needs than just

12    how do we dovetail the discovery from this one defendant with

13    this plaintiff over here.

14              THE COURT:  Mm-hmm.

15              MR. DE LA GARZA:  The plaintiff has not responded to

16    our discovery.  I mean, just nothing.  There's no letter to

17    the Court, --

18              THE COURT:  Okay.

19              MR. DE LA GARZA:  -- there's no discovery response.

20    So, that -- that's another issue that we're going to confer

21    with counsel about, like, when are you going to respond to our

22    discovery, because --

23              THE COURT:  Right.

24              MR. DE LA GARZA:  -- not that sets us back.  So, now

25    we've -- but now we have this issue where we may need to take
```

1   -- we need -- may need to get discovery from the plaintiff and

2   take the deposition of the plaintiff, to the extent that the

3   plaintiff's condition might be worsening.

4         And, you know, there are other issues involved here.

5   Apparently, she's -- she has another malpractice against

6   somebody for mistreating her for this illness and -- and that

7   -- we really need to get the records to see how do we separate

8   out what you're saying we did with what somebody else did.

9   So, the discovery is now becoming even more paramount, given

10  that we have this deteriorating condition of the plaintiff.

11  That is now going to impact other dates in the scheduling

12  order.

13        And so, if I may suggest this?  I think maybe the

14  best approach is that we need to confer and talk about what is

15  a realistic plan here.  We don't know what it is.  And I don't

16  believe that counsel here knows what it is, because I don't

17  think counsel knows exactly what her condition is.  He's got a

18  report from Mr. Tandy, but we really need to talk to Mr. Tandy,

19  who needs to get a good understanding of what's his client

20  capable of doing and when are they going to get us our

21  discovery.

22        THE COURT:  Well, --

23        MR. DE LA GARZA:  So, what I'd suggest that we do is

24  that we report back to you and tell you whether we think that

25  the scheduling order needs to be changed so that we can get a

1    plan that actually works for everybody.

2           MR. WARNER:  And -- and I do apologize.  We -- we

3    have been sifting through -- I -- I think that we've -- we've

4    gone through at least 6,000 pages of medical records already

5    and now we're just getting more and more.  And if -- and --

6    and we -- I mean, in all sincerity, I mean, we are apologetic

7    about that, but we would ask --

8           THE COURT:  You start to roll them out, I think.

9           MR. WARNER:  I'm sorry?

10          THE COURT:  Start to roll out those records.  You

11   know, you could -- what you've gone through, get in their

12   hands and but tell them that there's more to come.  It's a

13   rolling production.

14          MR. WARNER:  Okay.

15          THE COURT:  That's number one.  Number two, you

16   agree you should meet and confer --

17          MR. WARNER:  Absolutely.

18          THE COURT:  -- so you can get a handle on how far --

19   really what it's going to take for you to get there.  And then

20   start to -- find out exactly the -- how your client is doing.

21          MR. WARNER:  And -- and Your --

22          THE COURT:  And then maybe -- it may be that they

23   are going to want to take a *de bene esse* deposition and you're

24   not going to be ready, I would obviously give you the right to

25   come back later, assuming that's a viable right, to do a

1   discovery deposition or to do it at the same time, but to

2   continue it later after all the -- that -- that may or may not

3   help us.  I am just -- you know what?  You guys meet and

4   confer.

5           MR. WARNER:  We -- we -- we will need the four

6   weeks, though, to complete our -- at least our initial roll

7   out there, Your Honor.

8           THE COURT:  You should meet and confer ASAP about

9   this whole schedule.  Okay?

10          MR. WARNER:  Okay.

11          THE COURT:  I'm here when you're ready.

12          MR. WARNER:  Okay.

13          MR. DE LA GARZA:  Okay.

14          MS. WEISSLITZ:  Okay.

15          THE COURT:  All right?

16          MR. DINO:  May I ask a question?

17          THE COURT:  Mm-hmm.

18          MR. DINO:  Counsel had --

19          THE COURT:  No.  Go ahead.

20          MR. DINO:  Counsel referred to several times about

21  regulation and such in the EU and Canada.  I was just

22  wondering the Court's position on whether -- how it feels

23  about defendants' (indiscernible) information.

24          THE COURT:  I really don't like to do what I am

25  about to do, but I am not going to tell you, because I don't

1   know yet, because I think counsel again mentioned this is the

2   first time he's hearing about it and it hasn't been briefed.

3          Off the top of my head, I see pros and cons.  I

4   don't know -- I think, if you can't work that out, I think he

5   has to put it in front of me pretty quickly.

6          MR. DINO:  That's fine.  I just wanted to lodge my

7   objection so that there was no argument that it was made.

8          MR. WARNER:  Your Honor, can we just at least be

9   rest assured that we -- we have four weeks to complete our

10  initial roll out of --

11         THE COURT:  Yeah.  Yeah.

12         MR. WARNER:  Thank you.  Thank you.

13         THE COURT:  I -- yeah.  I -- I said that.  You have

14  the four weeks, --

15         MR. WARNER:  Okay.

16         THE COURT:  -- and when you say complete it, I just

17  wanted you to get it started.

18         MR. WARNER:  Yeah.

19         THE COURT:  You know, and because the way I

20  understood it, --

21         MR. WARNER:  Well, --

22         THE COURT:  -- you were holding everything and then

23  you were going to produce it.  I think you should start

24  getting information in their hands.

25         MR. WARNER:  No, no, and -- and absolutely, Your

1   Honor.  I -- and I -- I -- it just -- regrettably, because

2   there's so much that needs to be -- well, yeah, well -- well,

3   I don't need --

4              THE COURT:  Well, I -- I --

5              MR. WARNER:  -- we -- we don't need to --

6              THE COURT:  You don't need to apologize any more.

7   You put that on the record.  I got it.

8              MR. WARNER:  Okay.

9              THE COURT:  Just start getting it out, to the extent

10  you can.

11             MR. WARNER:  Uh-huh.

12             THE COURT:  Meet and confer to talk about a whole

13  schedule and you'll get your stuff done as soon as you can.

14             MS. WEISSLITZ:  Yes.  Yes.  Very good.

15             THE COURT:  Anything else?

16             MR. DE LA GARZA:  No, Your Honor.

17             MR. DINO:  No, Your Honor.

18             THE COURT:  Okay.

19             MR. WARNER:  I --

20             THE COURT:  Anything else?

21             MR. WARNER:  No, Your Honor.

22             THE COURT:  Okay.  Thank you.

23             MR. WARNER:  Thank you, Your Honor.

24             MS. WEISSLITZ:  Thank you.

25             MR. DE LA GARZA:  Thank you, Your Honor.

1              (Conference concluded at 1:10 p.m.)

2                     * * * * * * * * * *

3

4                    C E R T I F I C A T I O N

5         I, TERRY L. DeMARCO, court-approved transcriber,

6    certify that the foregoing is a correct transcript from the

7    electronic sound recording of the proceedings in the above-

8    entitled matter recorded on August 8, 2018 from 12:02:03 p.m.

9    to 1:10:51 p.m.

10

11

12    _____08/10/18_____          *S / Terry L. DeMarco*

13         Date                     Terry L. DeMarco, AD/T 566

14                                  KLJ Transcription Service

15

16

17

18

19

20

21

22

23

24

25